
ORIGINAL


FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX.
FT WORTH DIVISION

2006 JUN 28 PM 2: 29

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | Case No.: |
| Plaintiff, | § | **4 - 0 6 C V - 4 5 3 - A** |
| | § | |
| v. | § | |
| | § | |
| VIRBAC CORPORATION, THOMAS L. BELL, | § | |
| JOSEPH A. ROUGRAFF, DOUGLAS A. HUBERT, | § | |
| JAMES C. ROBISON, and CRAIG S. CAMPBELL | § | |
| | § | |
| Defendants. | § | |
| | § | |

## COMPLAINT

The United States Securities and Exchange Commission ("Commission") files this Complaint against Defendants Virbac Corporation ("Virbac" or the "Company"), Thomas L. Bell, Joseph A. Rougraff, Douglas A. Hubert, James C. Robison, and Craig S. Campbell (collectively, "defendants") and would respectfully show the Court as follows:

## SUMMARY

1.     This case concerns the revenue inflation and expense deferral scheme, from December 2000 to November 2003, by and on behalf of Virbac, a Fort Worth, Texas manufacturer and distributor of animal health products. The scheme was orchestrated by Bell, Virbac's former CEO and president, with the assistance of Rougraff, Virbac's former CFO, and Hubert, the former vice president of Virbac's Veterinary Division, and two Virbac customers— Vedco, Inc. ("Vedco") and Walco International, Inc. ("Walco"). The scheme involved the improper recognition of revenue by means of channel-stuffing, or "loading" of product to distributors, by recording revenue from sham transactions, and by recording revenue from transactions occurring after period-end. As a result of the scheme, Virbac met unrealistic revenue

and earnings projections and managed to sustain the illusion of rapid growth—by fraudulently inflating its revenues and net income by as much as 9% and 694%, respectively, in a given period. In the process, Virbac failed to comply with Generally Accepted Accounting Principles ("GAAP"). Virbac also manipulated reserves and accruals to overstate earnings.

2.      In furtherance of the scheme, Bell, with the assistance of Rougraff and Hubert, caused Virbac personnel to falsely document terms of transactions on invoices and other underlying documents. The true terms were established in side arrangements, per conversations and e-mails, which Bell, Rougraff, and Hubert failed to disclose to Virbac's auditors. In November 2003, the Company commenced an internal investigation and subsequently announced that it would restate its financial statements for the fiscal years 2001, 2002, and the first and second quarters of 2003. On April 29, 2005, Virbac filed its 2003 Form 10-K, which included audited restated financial statements for 2002 and 2001 and unaudited summary restated financial statements for 2000 and 1999. On May 6, 2005, Virbac filed its third quarter 2003 Form 10-Q. On August 30, 2005, Virbac filed its 2004 Form 10-K. On September 12, 2005, Virbac filed its first and third quarter 2004 Forms 10-Q. On September 13, 2005, Virbac filed its second quarter 2004 Form 10-Q. On October 25, 2005, Virbac filed its first and second quarter 2005 Forms 10-Q. On November 9, 2005, Virbac filed its third quarter 2005 Form 10-Q. On March 31, 2006, Virbac filed its 2005 Form 10-K. On May 15, 2006, Virbac filed its first quarter 2006 Form 10-Q and, as of the date of this Complaint, Virbac is current in its periodic reports.

3.      By reason of these activities: Defendant Virbac violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act") [15

U.S.C. §§78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1 and

13a-13 thereunder [17 C.F.R. §§240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13]; Defendants

Bell and Rougraff violated Section 17(a) of the Securities Act and Sections 10(b) and 13(b)(5) of

the Exchange Act and Rules 10b-5, 13a-14, 13b2-1 and 13b2-2 thereunder and aided and abetted

Virbac's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and

Rules 12b-20, 13a-1 and 13a-13 thereunder; Defendant Hubert violated Section 13(b)(5) of the

Exchange Act and Rules 13b2-1 and 13b2-2 thereunder and aided and abetted Virbac's

violations of Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules

10b-5, 12b-20, 13a-1 and 13a-13 thereunder; Defendant Robison aided and abetted Virbac's

violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Sections 13(a), 13(b)(2)(A)

and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder and aided

and abetted Defendants Bell, Rougraff and Hubert's violations of Section 13(b)(5) of the

Exchange Act and Rule 13b2-1 thereunder; and Defendant Campbell aided and abetted Virbac's

violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Sections 13(a), 13(b)(2)(A)

and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder and aided

and abetted Defendants Bell, Rougraff and Hubert's violations of Section 13(b)(5) of the

Exchange Act and Rules 13b2-1 and 13b2-2 thereunder.

## JURISDICTION AND VENUE

4.    The Commission brings this action pursuant to the authority conferred upon it by

Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)].

5.    This Court has jurisdiction over this action pursuant to Section 27 of the

Securities Exchange Act [15 U.S.C. §78aa] and Title 28 U.S.C. §1331.

6.     Venue is proper because many of the transactions, acts, practices and courses of business described below occurred within the jurisdiction of the Northern District of Texas.

## DEFENDANTS

7.     **Virbac**, a Delaware corporation headquartered in Fort Worth, Texas, is the result of the March 1999 acquisition of Agri-Nutrition Group Limited ("AGNU"), a publicly-held company, by Virbac Inc., a wholly-owned subsidiary of Virbac S.A., a French veterinary pharmaceutical manufacturer. Virbac's common stock is registered with the Commission under Section 12(g) of the Exchange Act. It was delisted from the NASDAQ National Market on January 23, 2004, for Virbac's failure to file timely its periodic reports, and was relisted on May 8, 2006.

8.     **Bell**, age 45, served as president and CEO of Virbac from April 1999, as well as a director from May 2002, until he resigned effective January 27, 2004. Bell signed all of the Company's Form 10-K filings during his tenure as CEO, as well as its Sarbanes-Oxley certifications. Bell received bonuses and stock options linked to his conduct worth $95,045.

9.     **Rougraff**, age 47, and a CPA licensed in the state of Indiana, served as vice president, CFO, and corporate secretary of Virbac from May 2000 until he resigned effective January 27, 2004. Rougraff signed each of the Company's periodic filings during his tenure as CFO, as well as its Sarbanes-Oxley certifications. Rougraff received bonuses linked to his conduct worth $26,668.

10.     **Hubert**, age 38, joined Virbac in March 1991 as a sales territory manager and served as vice president of the Veterinary Division from April 2000 until his resignation in January 2005. Hubert received bonuses linked to his conduct worth $19,057.

11.   **Campbell**, age 52, is the general manager of Vedco and, at all relevant times, was Virbac's principal Vedco contact.

12.   **Robison**, age 49, has served as chairman, CEO, and president of Walco since May 1997.

## RELATED ENTITIES

13.   **Vedco**, a privately-owned veterinary buying group based in St. Joseph, Missouri, with approximately $114 million in annual sales, was disclosed by Virbac as accounting for 18% and 12% of Virbac's net revenues in 2002 and 2001, respectively. Vedco is owned by nine veterinary supply companies that use Vedco to achieve economies of scale when purchasing products.

14.   **Walco**, based in Westlake, Texas, is the largest food animal health products distributor in North America, with over $600 million in annual revenues.

## FACTS

### A.   **Background**

15.   Shortly after the March 1999 merger of Virbac, Inc. with AGNU, Bell was named Virbac's CEO. Under Bell's leadership, and primarily through the introduction of new products, Virbac's revenues grew from $44 million in 1999 to $64 million in 2002. From January 2000 through September 2002, Bell, in press releases and conference calls, consistently expressed confidence that the Company would achieve its strategic goal of more than doubling revenues to $100 million by 2004. Together with Rougraff, Bell touted positive earnings results in press releases, investor presentations, and conference calls which they attributed primarily to successful product launches. Virbac's Veterinary Division, which accounted for approximately 50% of

Virbac's consolidated revenue, was portrayed by Bell and Rougraff as the principal driver of the Company's growth and success.

16.    Virbac's stock price rose in response to the Company's favorable operating results and Bell and Rougraff's upbeat statements—from $1.125 on March 5, 1999 to $8.35 on November 12, 2003. The November 12 price peak immediately preceded Virbac's announcement that it was commencing an internal investigation and delaying the filing of its third quarter 2003 Form 10-Q. Within two weeks of this announcement, Virbac confirmed it would be restating its financial statements. Virbac's senior executives benefited from the Company's inflated reporting of its financial performance, and consequent inflated stock price, by receiving bonuses and grants of incentive stock options.

**B.    Elements of the Scheme**

17.    To foster the illusion of rapid revenue and earnings growth, Bell devised a multi-pronged scheme to manipulate Virbac's financial statements. Bell was assisted in his scheme by Rougraff, Hubert, Robison, and Campbell. The scheme involved, among other things: 1) accelerating revenue recognition on shipments of product that exceeded distributors' current demands (i.e., Virbac's "loading" cycle); 2) recognizing revenue on sham transactions; 3) failing to cut off sales at fiscal period-end; and 4) deferring expenses, principally by manipulating reserves and accruals.

18.    Bell succeeded in carrying out his scheme for several reasons. First, Bell induced Virbac employees to effect the transactions giving rise to improperly accelerated revenues and deferred expenses. As a positive inducement, Bell linked the Virbac managers' incentive compensation plans to the fulfillment of sales and operating income goals. On the negative side, Bell threatened Virbac employees with personnel reductions and demotions if they failed to

achieve his unrealistic sales and income targets. Near the ends of fiscal quarters, Bell routinely sent e-mails exhorting employees to work harder to meet the stated goals, castigating them if they failed to meet his expectations.

19.     Another reason for the success of Bell's scheme was that there were material weaknesses in Virbac's internal controls. Pervasive internal controls weaknesses became apparent after the 1999 merger, which ultimately caused Virbac to delay the filing of its 1999 Form 10-K and to engage a major accounting firm to recommend controls improvements within Virbac's finance department. Although some recommendations were implemented, Virbac failed to address communication gaps among the sales, customer service and accounting departments, as well as widespread information systems weaknesses. As time passed and the activity progressed, the accounting firm was thwarted in its efforts to remedy the problems because of a concerted effort by Bell, Rougraff, and Hubert to avoid disclosing the actual terms of transactions conducted to accelerate the recognition of revenue and avoid the accrual of expenses.

20.     Finally, Bell and Hubert were able to convince Campbell and Robison, the heads of two distributors, Vedco and Walco, to assist in the activity. Vedco and Walco accounted for 90% of the invoices used to inflate Virbac's revenue. Of the two, Vedco enjoyed a more symbiotic relationship with Virbac—Vedco was Virbac's largest distributor and Virbac was one of Vedco's top five suppliers. In order to maintain that relationship, Campbell consented to the transactions requested by Hubert at Bell's direction. Walco, on the other hand, was a much larger company than Vedco with more tenuous ties to Virbac. Robison's primary motivation for assisting Virbac was his ambition for Walco to gain Virbac's warehousing and shipping outsourcing business. Bell's friendship with Robison was also exploited to Virbac's advantage. Neither Vedco nor Walco



derived any direct benefit from their participation in this scheme. Whatever the reasons for Campbell and Robison's collusion, Bell could not have carried it out without their substantial assistance.

### C.    The Revenue Inflation and Expense Deferral Scheme

21.    The combination of injudicious employee incentives, management's disregard and circumvention of inadequate internal controls, and the collusion of distributors comprised the backdrop for a pervasive revenue inflation and expense deferral scheme.

### 1.    Virbac "Loads Up" its Distributors

22.    In early 1999, shortly after Bell was named CEO, Virbac began "loading" its distributors to meet Bell's sales and income targets and to fulfill its mission statement: double-digit earnings growth through successful product launches. Behind the scenes, Virbac's executive team met with increasing frequency as the end of each quarter approached, to devise ways—chiefly illicit—to achieve internal revenue and operating income targets.

23.    The loading that resulted in the most significant inflations of revenue and earnings occurred in Virbac's Veterinary Division because it sold the products with the highest margins and the largest potential markets. Within the Veterinary Division, Hubert, at Bell's direction, relied heavily upon Campbell and Robison to execute Bell's strategy. Hubert was given discretion by Bell to grant whatever concessions were necessary to make "sales" in excess of distributors' current requirements. In some instances, Hubert, with approval from Bell, offered very long payment terms—180 days or more instead of a more typical 30 days—or even consignment terms to distributors. On other occasions, various volume discounts and rebates were given to induce large purchases. In many cases, Hubert, with Bell's knowledge, promised distributors that they could simply return large quantities of product for full credit, or exchange it for

replacement product, at a later date. These terms were rarely reflected in Virbac's books and records. Through these distributor enticements, Virbac improperly recorded revenue in violation of GAAP. Rougraff's circumvention of Virbac's internal controls and misleading statements or omissions to Virbac's auditors facilitated and perpetuated the scheme.

24.     The most excessive loading involved Virbac's new product launches, such as Preventic Plus (flea and tick collar), Iverhart Plus (heartworm medication), and its generic ivermectin pour-on products (cattle de-wormers). Additionally, Bell used product launches to accelerate revenue through a scheme in which Vedco and other customers were asked by Hubert, at Bell's direction, to purchase an existing product with the understanding it could be exchanged for a newly launched product when available. For example, Hubert pushed Preventic in the fourth quarter of 2000 in advance of the Preventic Plus launch, and pushed Preventic Plus and other products in the second and third quarters of 2001 in advance of the Iverhart Plus launch.

### a.      Preventic and Preventic Plus

### i.      Year Ended December 31, 2000

25.     At December 31, 2000, Hubert loaded $717,000 of Preventic flea collars into Virbac's sales channel in advance of the first quarter 2001 launch of the Preventic Plus flea and tick collar. Hubert promised the purchasers that they could return or exchange unsold product. The purchasers were Virbac distributors other than Vedco and Walco, and did not knowingly participate in the scheme. Rougraff, who was aware of significant returns after year-end, failed to accrue or disclose any estimated sales returns as required by Statement of Financial Accounting Standards No. 48, "Revenue Recognition When Right of Return Exists" ("FAS 48") even though he knew, prior to reporting Virbac's year-end numbers, that a single distributor



would likely return for credit $485,000 of Preventic. Loading during 2000 improperly added $717,000, or over 1%, to Virbac's reported revenues for 2000.

**ii.**     **Year Ended December 31, 2001**

26.     After initial Preventic Plus sales lagged behind Virbac's projections, Hubert assisted Bell in creating the appearance of a successful product launch by pushing Preventic Plus to meet Bell's second and third quarter 2001 sales and earnings targets. For example, Hubert requested that Campbell issue a Vedco purchase order for "half of his first order of Iverhart Plus in Preventic Plus," with the inducement that the product "could be kept on a trailer until needed." Campbell acceded to Hubert's request and caused Vedco to issue a $351,000 purchase order for Preventic Plus after Hubert granted extended payment terms of 150 days, versus the normal 30 days. Virbac paid for 102 days of storage fees until Campbell, at Hubert's insistence, finally accepted delivery of the collars. Contrary to FAS 48, Virbac recognized revenue, without regard to expected returns, when it invoiced Vedco on September 29, 2001.

27.     When the $351,000 invoice to Vedco came due on February 26, 2002, Rougraff and Bell were aware of, or approved, one or more extensions, totaling more than a year, through February 28, 2003, in lieu of requiring payment. Despite questions raised by Virbac's auditors in its quarterly reviews about increases in accounts receivable, neither Bell nor Rougraff disclosed to Virbac's auditors the payment term extensions. Vedco viewed this shipment as a consignment, and ultimately paid only $41,000 for the collars it actually sold. The balance of the shipment expired in Vedco's warehouse, and Virbac was forced to issue Vedco a $308,000 credit in the fourth quarter of 2003, after Virbac's auditors discovered the fraud. The $351,000 should not have been included in revenue for the third quarter of 2001, because payment was contingent upon resale by Vedco and because it was probable that the collars would be returned or replaced

after they expired. This transaction resulted in a 3% overstatement of actual third quarter 2001 revenues.

b. **Iverhart Plus**

i. **Year Ended December 31, 2001**

28.    In early 2001, Virbac heralded Iverhart Plus as a high-growth opportunity. Bell forecasted in press releases that Virbac would obtain FDA approval of Iverhart Plus by the end of the first quarter 2001. Due to regulatory delays, however, Virbac did not have the necessary approvals to ship Iverhart Plus until the fourth quarter of 2001. Although these delays severely limited the product's contribution to 2001 sales and earnings growth, Virbac reported $1.1 million of fourth quarter Iverhart Plus sales. Approximately $600,000 of that Iverhart Plus was shipped to Vedco with the explicit agreement, approved by Bell and documented in an e-mail between Hubert and Campbell, that any unsold product could be returned in 90 days for full credit.

29.    Bell and Rougraff knew that returns would be high on the initial August 2001 production batches—due to product expiration caused by Iverhart Plus's limited shelf life and the time elapsed between the batches' manufacture dates and the postponed product launch—and Virbac's budget for 2001 reflected returns of approximately 20% of sales. In spite of high anticipated returns on these shipments, Rougraff recorded no reserve for Iverhart Plus returns at December 31, 2001. Furthermore, Bell and Rougraff represented to Virbac's auditors, in connection with the 2001 year end audit, that management's best estimate was that there would be no returns related to the initial launch of Iverhart Plus. Because of the granting of return rights and the failure to record a reserve, Virbac's fourth quarter 2001 revenues were overstated by as much as $600,000, or 5%.

## ii.    Quarter Ended March 31, 2002

30.    In an effort to meet Bell's revenue and earnings targets, Hubert convinced Campbell at the end of the first quarter 2002 to issue a purchase order for $1.6 million of Iverhart Plus—all of Virbac's available inventory. In order to maximize first quarter 2002 revenues, Bell even authorized Virbac employees to assist its Iverhart Plus supplier in packaging the product to increase the inventory available for shipping to Vedco. Hubert reiterated to Campbell, with Bell's concurrence, that any expired product would be replaced at no cost to Vedco. Although payment terms were stated as 90 days on the invoice, Campbell understood that he had no obligation to pay until, and unless, Vedco sold the product.

31.    Because Virbac shipped all remaining Iverhart Plus inventory to Vedco, it had no available inventory to fill other customers' orders at the beginning of the second quarter 2002. To remedy this problem, Bell, Rougraff, and Hubert conspired to conceal Virbac's over-shipment of inventory to Vedco by requesting that Vedco, with the knowledge of Campbell, ship product from Vedco to other Virbac customers. As a result, Virbac improperly recognized revenue from a second shipment of the same product—from Vedco to another distributor—and sidestepped reversal of the first "sale" to Vedco by shipping "replacement" product at no cost to Vedco. Campbell admitted that he and Hubert had agreed to the scheme during the first quarter of 2002. Although Vedco made some payments on Iverhart Plus sales throughout 2002, Virbac was forced to issue $857,000 of credits to Vedco in the fourth quarter of 2003 for the remainder of this product, which had expired. Bell and Rougraff further inflated reported earnings by not recording a reserve for anticipated returns of Iverhart Plus, in spite of the fact Virbac's auditors, in its first quarter 2002 review, proposed an accrual of $98,000. Additionally, Bell, Rougraff,

and Hubert failed to disclose to Virbac's auditors the fact that anticipated returns of expired product were higher than the auditors' proposed adjustment at the end of the first quarter 2002.

32.     In its May 2, 2002 earnings release, Virbac announced record revenue and operating income results for the first quarter 2002. In the release, Bell stated that the Veterinary Division's sales "jumped 72% year-over-year, marked by early impressive sales for newcomers Iverhart Plus and Preventic Plus." In reality, had Virbac properly deferred revenue recognition on the shipments of Iverhart Plus to Vedco, or accrued management's estimate of returns as required by FAS 48, it would have reported *declines* in same-quarter sales and less optimistic growth rates for its Veterinary Division. Bell, Rougraff, and Hubert knew that the earnings release's sales figure was overstated because they understated anticipated returns. Virbac's restated revenues included a $1.6 million adjustment (due to an 11% overstatement of actual first quarter 2002 sales) to reduce first quarter 2002 Iverhart Plus revenues.

### iii.     Quarter Ended June 30, 2002

33.     At the end of the second quarter 2002, Hubert again convinced Campbell to issue a Vedco purchase order for $598,000 of Iverhart Plus, even though Vedco had not sold $1.4 million of the $1.6 million of Iverhart Plus it acquired in the prior quarter. Again, Campbell viewed Vedco's obligation to pay as contingent upon resale. None of the new shipment was sold by Vedco. A reserve of $69,000 for returns of Iverhart Plus was recorded at the end of the second quarter of 2002; however, Bell, Rougraff, and Hubert knew that anticipated returns would be higher as a result of the high percentage of inventory at Vedco that would become unmarketable within 90 days and require replacement due to expiration dates. Vedco ultimately made no payments on the second quarter 2002 shipment and Virbac was forced to issue a credit

to Vedco for the entire $598,000 invoice amount in the fourth quarter of 2003, after Virbac's auditors discovered the fraud.

### c. **Pour On Products**

34. During 2001, Virbac entered into development, license, and supply agreements whereby it granted Walco, Vedco, and another distributor exclusive distribution rights to its pour-on product line. On November 13, 2001, Bell issued a misleading press release for the three months and nine months ended September 30, 2001, in which he attributed record revenues, in part, to the $1.2 million in sales of its "recently FDA approved pour-on product." He failed to disclose, however, that it was not until mid-October—after quarter end—that Virbac came into compliance with all FDA labeling prerequisites to begin distributing and marketing the pour-on products. Accordingly, Virbac did not have FDA authorization to ship pour-on products in September and should not have recognized the related $1.2 million of revenue in the third quarter of 2001.

35. At the end of 2001, with Virbac facing a revenue shortfall, Bell convinced Robison to have Walco purchase another $800,000 of pour-on products, even though Walco had not sold any of the approximately $900,000 of pour-on unlawfully shipped at the end of September 2001. Walco, at Bell's request, sent a purchase order with 120-day payment terms while simultaneously entering into an undisclosed side agreement with Bell pursuant to which payments were not required until Walco sold the product. Bell knew, however, that Walco was contractually unable to sell Virbac's pour-on products until it terminated its exclusive distribution agreement with another manufacturer, which did not occur until the second quarter of 2002.

36.     Virbac improperly recognized revenue on another $1.3 million of pour-on invoiced to Vedco and another distributor on December 28, 2001. The transactions were documented as valid bill-and-hold sales. The sales, however, did not comply with GAAP for two reasons: 1) Virbac, rather than Vedco, initiated them and 2) they lacked fixed delivery dates. Rougraff misled Virbac's auditors into believing that all bill-and-hold criteria had been met as of the date of the transaction. When Virbac's auditors appropriately requested third party confirmation, Campbell instructed a subordinate to sign and return the confirmation, even though Campbell knew or should have known that some of the representations were false. All $1.3 million of revenue was improperly recognized at the time the invoice was issued.

37.     In total, Virbac prematurely recognized $3.1 million of revenue in 2001 (a 5% overstatement of its actual 2001 sales) related to pour-on transactions. Moreover, Bell issued, and Rougraff reviewed, a materially misleading announcement of record sales for the three and twelve months ended December 31, 2001, attributing the initial shipments of Iverhart Plus and a 40% increase in its contract manufacturing division's sales primarily to sales of pour-on products.

### 2.     Revenue and Earnings Overstated via Sham Transactions

38.     In addition to improperly accelerating revenue recognition on actual transactions, Virbac improperly recognized revenues on sham transactions fabricated by Virbac management.

#### a.     Fabricated Purchase Order Results in Overstatement of Third Quarter 2002 Earnings

39.     At the end of the third quarter of 2002, when an anticipated order was not received, Virbac employees, on Bell's instruction and with Hubert's knowledge, fabricated a $255,000 order based on the distributor's purchase history and products available for shipment. Immediately after quarter-end, Virbac arranged for the shipment to be returned when it received a legitimate, but materially different, purchase order from the same vendor. Shortly after

quarter-end, Rougraff learned that the purported oral purchase order differed substantially from the real purchase order received after quarter-end. Nonetheless, Bell and Rougraff reported the associated revenue and elected not to record a correcting adjustment proposed by Virbac's auditors—because they deemed it immaterial.

### b. Logistics Arrangement Results in Overstatement of Fourth Quarter 2002 Earnings

40. At the end of the fourth quarter 2002, Bell conceived and implemented a scheme, with Robison's assistance, to inflate Virbac's revenue by shipping $560,000 of Iverhart Plus to Paragon Logistics ("Paragon"), a division of Walco. The transaction was documented in Virbac's books and records as a sale to Walco. Bell separately negotiated an arrangement whereby Virbac would have Paragon ship the product to other Virbac customers and it would pay Paragon a logistics fee for warehousing and freight costs. Although Hubert, at Bell's instruction, attempted to maintain the guise that the transaction was a sale, the scheme failed. Ultimately the entire shipment expired, no replacement product was shipped, and Virbac was forced to issue a credit to Walco for the entire invoice amount. Hubert failed to identify the $560,000 of expired inventory in Virbac's records, causing Virbac's replacement reserves to be understated. Bell admitted that not all the terms of the Paragon transaction had been finalized by December 31, 2002. Hubert stated that Bell's determination to recognize revenue on this "half-baked" transaction was ill-advised because no customer was obligated to purchase the product that Virbac had stuffed into a "logistics" warehouse. By including this sale in its books and records, Bell was able to achieve Virbac's operating income target for 2002, but not its revenue target.

### c. Unauthorized Preventic Plus Credit

41.    At the end of the second quarter 2003, Bell again scrambled to increase Virbac's reported earnings.  With Rougraff's assistance, Bell caused an improper $43,000 receivable purportedly from Virbac, S.A. ("VBSA"), a French corporation that owns approximately 60% of Virbac's outstanding common stock, to be recorded.  This $43,000 adjustment was allegedly for an agreement Bell made with VBSA's chief operating officer, who also serves as a Virbac director, for VBSA to reimburse Virbac for 50% of the cost of expired Preventic collars.  VBSA's chief operating officer, however, tersely rejected Bell and Rougraff's June 2003 request for reimbursement, replying in a July 11, 2003 e-mail to Bell that there was no such agreement.  Although Bell and Rougraff knew that the receivable on Virbac's books at June 30, 2003 was not collectible and should not have been recorded, neither corrected the error prior to Virbac's filing its Form 10-Q on August 8, 2003, nor alerted Virbac's auditors.  Management's intentional misstatement of earnings and concealment from Virbac's auditors renders this otherwise immaterial amount material based upon the guidance contained in AICPA Professional Standard AU §§ 316.34 and 316.35 and Staff Accounting Bulletin No. 99, *Materiality*.

### 3. Revenues and Earnings Boosted by Improperly Extending Quarters

42.    Virbac also inflated its reported revenues and earnings through an improper sales cutoff, including recognizing revenue on 1) shipments occurring after midnight of the last date of a period and 2) shipments for which Virbac paid storage fees until customers would accept delivery.

### a. Shipments after Midnight

43.    On the day after the end of the first quarter of 2003, Bell and Rougraff learned that employees had stayed after midnight to load product on trailers.  Bell and Rougraff

concluded, without attempting to quantify the dollar amount, that the shipments were not material. During the restatement process, the amount of these shipments was determined to be $290,000, or a 2% overstatement of Virbac's actual sales for that quarter. In the second quarter of 2003, this time at Bell's insistence, Virbac employees again stayed after midnight on June 30 to load trailers in an effort to ship all available orders before quarter-end. Revenue of $510,000, related to shipments after midnight on June 30, was nonetheless included in Virbac's second quarter sales figure—a 3% overstatement. Bell and Rougraff each knew that employees had stayed after midnight, but did nothing to quantify the amounts involved or to correct the revenue prematurely recorded. Neither Bell nor Rougraff disclosed the after-midnight shipments to Virbac's auditors in connection with its reviews of the first or second quarters of 2003.

### b.     **Shipments with Delayed Delivery**

44.     Virbac also inflated revenue and earnings by accelerating revenue recognition on product shipped prior to quarter-end but held by the shipper until the customer would accept delivery, a practice which was referred to as "staging." These shipments were generally held four to 18 days into the following quarter. From 2001 through 2003, quarterly revenues were inflated between $252,000 and $1,900,000—2% to 10%—as a result of staging, which was executed primarily at the request of Vedco.

45.     Because Virbac paid related storage charges, and customers were not willing to accept delivery prior to quarter-end, these transactions did not qualify for immediate revenue recognition under GAAP. Chapter 1A of ARB No. 43, paragraph 1, states that "[p]rofit is deemed to be realized when a sale in the ordinary course of business is effected, unless the circumstances are such that the collection of the sale price is not reasonably assured." The Board reaffirmed this statement in APB Opinion No. 10, paragraph 12, stating "revenues should

ordinarily be accounted for at the time a transaction is completed, with appropriate provision for uncollectible accounts." As a result of the specified delayed delivery date, Virbac should not have recognized revenue until the transaction was completed, i.e., when delivery occurred.

### 4. Earnings Overstated by Manipulating Reserves and Accruals

46. In addition to overstating revenues, Bell, Rougraff, and Hubert also manipulated expenses such as reserves, accruals, and sales credits, and their associated books and records, to maintain the illusion that Virbac was meeting internal and external sales and earnings forecasts. Bell frequently called for quarter-end and year-end numbers to be "scrubbed," reserves to be "cut to the bone," and expenses to be identified for deferral. Rougraff and Hubert carried out these improper requests.

### a. Iverhart Plus Replacement Reserves

47. Although Bell and Hubert emphasized to distributors that expired product could be returned for full credit or replacement product, they resisted issuing credits in order to lessen the negative impact on Virbac's reported earnings. Instead, they promised, but often failed, to ship replacement product. In order to avoid increasing reserves for the replacement product, Hubert concealed the full extent of expiring or expired product, especially Iverhart Plus, in schedules prepared for Rougraff. These schedules were also provided by Virbac to its auditors for testing the reasonableness of Virbac's accruals. (This problem, and its impact on Virbac's financial statements, is more fully detailed above, in the discussion of the loading of Iverhart Plus.)

48. One particularly egregious example of Iverhart Plus reserve manipulation occurred during the fourth quarter of 2002. To avoid increasing Virbac's accrual, Hubert, with the consent of Campbell, caused Virbac to invoice Vedco for $258,000 of product previously

shipped to Vedco at no cost as replacement for expired product. Hubert explained to Campbell in January 2003 that he needed this "favor" to help Virbac avoid increasing its Iverhart Plus replacement reserve; Virbac's auditors had requested the reserve. As a result of this subterfuge, Hubert achieved two positive outcomes. First, he was able to disguise as revenue from a new sale what should have been recognized as an expense to Virbac. More significantly, however, Hubert was able to mask the true percentage of expired product, which in turn understated Virbac's estimated liability for replacement product. Additionally, Hubert mischaracterized the debit memo invoicing Vedco as a correction of an invoice inadvertently issued without pricing information. This led to the deception of Virbac's auditors during the 2002 audit regarding the true nature of this transaction and its impact on Virbac's reserve for expired Iverhart Plus.

### b.     Reserves for Excess, Obsolete, Slow-Moving Inventory

49.     From the day he started as Virbac's CEO, Bell knew that there were substantial quantities of excess, obsolete, or slow-moving inventory. Virbac's board also had general concerns about the amount of working capital tied-up in inventory, and appointed Rougraff to lead a task force to eliminate excess, obsolete, or slow-moving inventory. Despite limited progress in reducing inventory, neither Bell nor Rougraff caused Virbac to record appropriate reserves against inventory or to alert Virbac's auditors that the reported inventory was in excess of realizable value. Also, Hubert provided false sales information on which to base the reserve calculations. As part of the restatement, Virbac recorded adjustments to increase the reserve from $200,000 to $1.9 million. This amount was subsequently increased to $3.9 million in Virbac's 2003 Form 10-K.

**D.      Bell Repeatedly Affirmed Confidence in Achieving Unsupportable Sales and Income Targets**

50.      In addition to inflating revenues and understating expenses in Virbac's SEC filings and earnings releases, Bell continually expressed confidence, in earnings calls and press releases, in Virbac's achieving the unsupportable goals of $100 million in sales and $20 million in operating income by 2004. From as early as May 2001 through at least September 2002, Bell consistently stated in press releases, conference calls, and investor presentations, that the growth of the pet industry and a "full pipeline of new, innovative products" would fuel Virbac's growth. Similarly, Bell would often claim, in the announcement of new products, that they would significantly contribute to Virbac's accomplishing its goal of $100 million in sales and $20 million in operating income by 2004. None of the press releases disclosed that achievement of this goal was premised on the completion of significant hoped for, but unidentified, acquisitions.

51.      Bell's unwavering public optimism is contradicted by internal Virbac documents. In particular, after negotiations for a proposed acquisition were terminated in mid-2002, Virbac's board members believed that attaining $100 million in sales and $20 million in operating income would be very difficult, if not impossible, in the foreseeable future. Nonetheless, on September 5, 2002, Bell approved a press release in which he reiterated his "confidence" that Virbac would achieve its forecast of $100 million in sales and $20 million in operating income by 2004. On September 9, 2002, VBSA's chief operating officer chastised Bell in an e-mail for reiterating this claim:

> This point is certainly the most critical one for us in the current post Enron environment in US. We think it's inappropriate to keep writing in our financial communication that we will reach the 100/20 figures. This given our current knowledge on [Virbac] perspectives supported by documents that have been shared by all Directors. We consider [Virbac] and its Directors could be considered as releasing a misleading information. Tom, this topic was already discussed in the last

Boards. We think we should share it again with all the Directors during the next one, given it's [sic] importance.

52.     In response to this e-mail, Bell defended the disclosure, arguing that as soon as he became certain that Virbac would not achieve the forecast, he would immediately issue a press release to that effect. However, Bell never corrected the guidance he gave to the market, never disclosed that Virbac no longer expected to reach the forecast through internal growth, and never disclosed that Virbac increasingly relied upon a series of acquisitions to meet these goals, many of which were not yet beyond the exploratory stage.

### E.     Discovery of the Scheme

53.     In connection with its third quarter 2003 review of Virbac's financial statements, Virbac's auditors discovered that the payment terms of four large Vedco invoices, for Preventic Plus and Iverhart Plus, in Virbac's current accounts receivable had been extended by up to a year. Bell and Rougraff's inadequate explanations of the due date extensions prompted Virbac's auditors to demand that Virbac's audit committee commence a "special investigation" into the matter. The audit committee appointed independent counsel to conduct an investigation. Independent counsel, with the assistance of their forensic accountants, uncovered numerous problems, dating back several years, with Virbac's accounting. In addition to the improper revenue recognition associated with the four Vedco invoices, which were at best consignments, the investigation revealed several facets of the scheme described above.

54.     As a consequence of the investigation, Bell and Rougraff resigned effective January 27, 2004. Hubert resigned in January 2005.

**F.** **Financial Impact of the Scheme**

    **1.** **Financial Statements**

    55.    On April 29, 2005, approximately 15 months after the completion of the special investigation, Virbac finally restated its financial results for the years 1999 through 2002, together with the first and second quarters of 2003, by filing its 2003 Form 10-K. The following table shows the impact of the restatement on the Company's previously reported revenues and earnings (dollar amounts in thousands):

| | | Revenue | | | Net Income (Loss) | | |
|---|---|---|---|---|---|---|---|
| **Year Ended:** | **Form** | **Originally Reported** | **As Restated** | **% Misstated** | **Originally Reported** | **As Restated** | **% Misstated** |
| Dec. 31, 1999 | 10-K | $ 43,717 | $ 43,341 | 0.9% | $ (544) | $ (2,097) | 74.1% |
| Dec. 31, 2000 | 10-K | $ 52,965 | $ 51,486 | 2.9% | $ 2,943 | $ (1,044) | 381.9% |
| Dec. 31, 2001 | 10-K | $ 60,628 | $ 56,945 | 6.5% | $ 1,310 | $ ( 897) | 246.0% |
| Dec. 31, 2002 | 10-K | $63,752 | $ 60,923 | 4.6% | $ 3,379 | $ (1,323) | 355.4% |
| **Quarter Ended:** | | | | | | | |
| March 31, 2003 | 10-Q | $ 15,437 | $ 14,283 | 8.1% | $ (659) | $ (1,960) | 66.4% |
| June 30, 2003 | 10-Q | $ 19,078 | $ 17,534 | 8.8% | 1,193 | $ (201) | 693.5% |

    **2.** **Stock Price**

    56.    Virbac's stock price tumbled—from $8.35 per share on November 12, 2003, when Virbac disclosed delays in filing its Form 10-Q, to $2.70 on February 20, 2004, when Virbac disclosed the staff's investigation. The Company's market capitalization decreased by approximately $125 million—from $185.5 million on November 12, 2003, to $60 million on February 20, 2004.

## CLAIMS
### FIRST CLAIM
### Violations of Securities Act Section 17(a)

57.     Paragraphs 1 through 56 are realleged and incorporated by reference.

58.     Defendants Virbac, Bell and Rougraff, in the offer or sale of securities, have:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

59.     Defendants Virbac, Bell and Rougraff engaged in the conduct described in this claim knowingly or with severe recklessness.

60.     By reason of the foregoing, Virbac, Bell and Rougraff violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM
### Violations of Exchange Act
### Section 10(b) and Rule 10b-5

61.     Paragraphs 1 through 56 are realleged and incorporated by reference.

62.     Defendants Virbac, Bell and Rougraff, in connection with the purchase or sale of securities, have:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

63.     Defendants Virbac, Bell and Rougraff engaged in the conduct described in this claim knowingly or with severe recklessness.

64.     By reason of the foregoing, Virbac, Bell and Rougraff violated Section 10(b) of the Exchange Act. [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM
### Violations of Section 13(a) of the Exchange Act
### and Rules 12b-20, 13a-1 and 13a-13

65.     Paragraphs 1 through 56 are realleged and incorporated by reference.

66.     Section 13(a) of the Exchange Act, [15 U.S.C. §78m(a)], requires issuers such as Virbac to file periodic reports with the Commission containing such information as the Commission prescribes by rule. Exchange Act Rule 13a-1, [17 C.F.R. §240.13a-1], requires issuers to file annual reports and Exchange Act Rule 13a-13, [17 C.F.R. §240.13a-13], requires issuers to file quarterly reports. Under Exchange Act Rule 12b-20, [17 C.F.R. §240.12b-20], the reports must contain, in addition to disclosures expressly required by statute and rules, other information as is necessary to ensure that the statements made are not, under the circumstances, materially misleading.

67.     By reason of the foregoing, Virbac violated Section 13(a) of the Exchange Act, [15 U.S.C. §78m(a)], and Rules 12b-20, 13a-1, 13a-13, [17 C.F.R. §§240.12b-20, 240.13a-1, 240.13a-13].

## FOURTH CLAIM
### Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rule 13b2-1

68.     Paragraphs 1 through 56 are realleged and incorporated by reference.

69.     Section 13(b)(2)(A), [15 U.S.C. §78m(b)(2)(A)], of the Exchange Act requires all issuers to make and keep books, records, and accounts that, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets. Exchange Act Rule 13b2-1, [17

C.F.R. §240.13b2-1], prohibits falsification of accounting records subject to Section 13(b)(2)(A) of the Exchange Act.

70.    Section 13(b)(2)(B) of the Exchange Act, [15 U.S.C. §78m(b)(2)(B)], requires issuers to devise and maintain an adequate system of internal accounting controls.

71.    By reason of the foregoing, Virbac violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, [15 U.S.C. §§78m(b)(2)(A) and 78m(b)(2)(B)], and Rule 13b2-1, [17 C.F.R. §240.13b2-1].

### FIFTH CLAIM
### Violations of Exchange Act
### Section 13(b)(5) and Rules 13b2-1 and 13b2-2

72.    Paragraphs 1 through 56 are realleged and incorporated by reference.

73.    Defendants Bell, Rougraff and Hubert violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] by knowingly circumventing or knowingly failing to implement a system of internal accounting controls at Virbac, or knowingly falsifying Virbac's books, records or accounts. Additionally, Bell, Rougraff and Hubert violated Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1] by, directly or indirectly, falsifying or causing to be falsified, the books, records or accounts of Virbac subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]. Furthermore, Bell, Rougraff and Hubert violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2] by making, or causing to be made, materially false or misleading statements or omissions to an accountant or auditor.

### SIXTH CLAIM
### Violation of Exchange Act Rule 13a-14

74.    Paragraphs 1 through 56 are realleged and incorporated by reference.

75.    Bell and Rougraff each certified Virbac's quarterly reports on Form 10-Q for the third quarter of 2002 and the first and second quarters of 2003, pursuant to Section 302 of the

Sarbanes-Oxley Act of 2002 and Rule 13a-14. Specifically, Bell and Rougraff each certified that he had reviewed the reports and that, based on his knowledge, they did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and based on his knowledge, the financial statements and other financial information included in the quarterly reports, fairly presented in all material respects the financial condition, results of operations and cash flows of Virbac of, and for, the periods presented in the quarterly reports.

76.     Bell and Rougraff each certified Virbac's 2002 annual report on Form 10-K, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14. Specifically, Bell and Rougraff each certified that he had reviewed the report and that, based on his knowledge, it did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and based on his knowledge, the financial statements and other financial information included in the annual report, fairly presented in all material respects the financial condition, results of operations and cash flows of Virbac of, and for, the periods presented in the annual report.

77.     Bell and Rougraff knew or were severely reckless in not knowing that the reports they certified contained untrue statements of material fact and omitted to state material facts necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

78.     By reason of the foregoing, Bell and Rougraff violated Rule 13a-14 [17 C.F.R. § 240.13a-14] promulgated under Section 302 of the Sarbanes-Oxley Act of 2002.

## SEVENTH CLAIM
### Aiding and Abetting Violations
### of Sections 17(a)(2) and 17(a)(3) of the Securities Act

79.     Paragraphs 1 through 56 are realleged and incorporated by reference.

80.     Based on the conduct alleged herein, Virbac violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

81.     Defendants Campbell and Robison, acting alone or in concert with others, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to Virbac in connection with its violations of Sections 17(a)(2) and 17(a)(3) as alleged herein.

82.     By reason of the foregoing, Campbell and Robison aided and abetted Virbac's violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)

## EIGHTH CLAIM
### Aiding and Abetting Violations of
### Exchange Act Section 10(b) and Rule 10b-5

83.     Paragraphs 1 through 56 are realleged and incorporated by reference.

84.     Based on the conduct alleged herein, Virbac violated Section 10(b) of the Exchange Act and Rule 10b-5 by filing materially misleading annual and quarterly reports with the Commission and by making public misrepresentations resulting from the improper revenue recognition.

85.     Defendant Hubert, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to Virbac in connection with its violations of Section 10(b) and Rule 10b-5.

86.     By reason of the foregoing, Hubert aided and abetted Virbac's violations of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. §§ 240.10b-5].

**NINTH CLAIM**
**Aiding and Abetting Violations of Exchange Act**
**Section 13(a) and Rules 12b-20, 13a-1 and 13a-13**

87.     Paragraphs 1 through 56 are realleged and incorporated by reference.

88.     Based on the conduct alleged herein, Virbac violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

89.     Defendants Bell, Rougraff, Hubert, Campbell and Robison, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to Virbac, as an issuer of a security registered pursuant to Section 12 of the Exchange Act, in its failing to file with the Commission, in accordance with rules and regulations the Commission has prescribed, information and documents required by the Commission to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12 of the Exchange Act and annual reports and quarterly reports as the Commission has prescribed.

90.     By reason of the foregoing, Bell, Rougraff, Hubert, Campbell and Robison aided and abetted Virbac's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

**TENTH CLAIM**
**Aiding and Abetting Violations of Exchange Act**
**Sections 13(b)(2)(A) and 13(b)(2)(B)**

91.     Paragraphs 1 through 56 are realleged and incorporated by reference.

92.     Based on the conduct alleged herein, Virbac violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

93.     Defendants Bell, Rougraff, Hubert, Campbell and Robison, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to Virbac in connection with its failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected Virbac's transactions and dispositions of its assets.

94.     Defendants Bell, Rougraff, Hubert, Campbell and Robison, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to Virbac in connection with its failure to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

95.     By reason of the foregoing, Bell, Rougraff, Hubert, Campbell and Robison aided and abetted Virbac's violation of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## ELEVENTH CLAIM
### Aiding and Abetting Violations of Exchange Act
### Section 13(b)(5) and Rules 13b2-1 and 13b2-2

96.     Paragraphs 1 through 56 are realleged and incorporated by reference.

97.     Based on the conduct alleged herein, Bell, Rougraff and Hubert violated Section 13(b)(5) of the Exchange Act and Rules 13b2-1 and 13b2-2 thereunder.

98.     Defendants Campbell and Robison, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to Bell, Rougraff and Hubert, in connection with their knowing circumvention or knowing failure to implement a system of internal accounting controls at Virbac, or knowing falsification of Virbac's books, records or

accounts. Additionally, Campbell and Robison, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to Bell, Rougraff and Hubert, in connection with their falsification or causing to be falsified, the books, records or accounts of Virbac subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]. Furthermore, Campbell, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to Bell, Rougraff and Hubert, in connection with his making, or causing to be made, materially false or misleading statements or omissions to Virbac's auditor.

99. By reason of the foregoing, Campbell and Robison aided and abetted Bell, Rougraff and Hubert's violations of Exchange Act Sections 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1], and Campbell aided and abetted Bell, Rougraff and Hubert's violations of Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## **REQUEST FOR RELIEF**

For these reasons, the Commission respectfully requests that the Court enter a judgment:

(a) permanently enjoining Virbac from violating Section 17(a) of the Securities Act, and Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder;

(b) permanently enjoining Bell and Rougraff from violating Section 17(a) of the Securities Act, and Sections 10(b), and 13(b)(5) of the Exchange Act and Rules 10b-5, 13a-14, 13b2-1 and 13b2-2 thereunder, and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder;

(c) permanently enjoining Hubert from violating Section 13(b)(5) of the Exchange Act and Rules 13b2-1 and 13b2-2 thereunder and from aiding and abetting violations of Section

10(b), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1 and 13a-13 thereunder;

(d)   ordering Bell to pay disgorgement of $95,045 in ill-gotten gains, plus prejudgment interest;

(e)   ordering Rougraff to pay disgorgement of $26,668 in ill-gotten gains, plus prejudgment interest;

(f)   ordering Hubert to pay disgorgement of $19,057 in ill-gotten gains, plus prejudgment interest, provided, however, that the Commission waive payment based on his sworn financial statement and other documents;

(g)   ordering Bell to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78uA] in the amount of $150,000;

(h)   ordering Rougraff to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78uA] in the amount of $100,000;

(i)   prohibiting Bell and Rougraff, under Section 20(e) of the Securities Act [15 U.S.C. § 77t(d)(4)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78l], from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

(j)   prohibiting Hubert, under Section 20(e) of the Securities Act [15 U.S.C. § 77t(d)(4)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78l], from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange

*SEC v. Virbac Corporation, et al.*                                           Page 32
Complaint

Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] for a period of five (5) years;

(k)     ordering Campbell to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78uA] in the amount of $50,000;

(l)     ordering Robison to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78uA] in the amount of $50,000; and

(m)     granting such other relief as this Court may deem just or appropriate.


Dated: June 28, 2006

Respectfully submitted,

Jeffrey B. Norris
Washington, D.C. Bar No. 424248
Attorney for Plaintiff
SECURITIES & EXCHANGE
COMMISSION
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, Texas  76102-6882
(817) 978-6452
(817) 978-4927 (fax)
norrisj@sec.gov

JS 44 (Rev. 1999)

# ORIGINAL

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

NORTHERN DIST. OF TX.
FT WORTH DIVISION

## I.(a) PLAINTIFFS

SECURITIES AND EXCHANGE COMMISSION

## DEFENDANTS

VIRBAC CORPORATION, THOMAS L. BELL, JOSEPH A. ROUGRAFF, DOUGLAS A. HUBERT, JAMES C. ROBISON, and CRAIG S. CAMPBELL

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: Tarrant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEY (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Jeffrey B. Norris, Esq.
Securities & Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX  76102-6882
(817) 978-6452

ATTORNEYS (IF KNOWN)

## 4 - 0 6 C V - 4 5 3 - A

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES
(For Diversity Cases Only)

(PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PTF | PTF | | PTF | PTF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 156 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | | | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copy rights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☒ 850 Securities Commodities/Exchange |
| | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | |
| ☐ 153 Recovery OF Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395FF) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

## V. ORIGIN

(PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (Specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to Distnct Judge from Magistrate Judge

**CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.) Sections 17(a), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a), 77q(a)(2), and 77q(a)(3)], and Sections 10b, 13(a), 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and 77m(b)(5)], Rules 10b-5, 12b-20, 13a-1, 13a-13, 13a-14, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13, 240.13a-14, 240.13b2-1, and 240.13b2-2].

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND ☐ YES   ☒ NO

## VIII. RELATED CASE(S) (See Instructions): IF ANY

JUDGE Honorable Terry R. Means   DOCKET NUMBER 4:03-cv-1461-Y [consolidated with 4:04-cv-037-Y]

DATE 6/28/2006

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

Receipt # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____